**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION**

| | | |
|---|---|---|
| Danielle Parks, | : | Case No. 1:13CV1530 |
| Plaintiff, | : | |
| vs. | : | |
| Commissioner of Social Security Administration, | : | **MEMORANDUM AND ORDER** |
| Defendant. | : | |

Plaintiff seeks judicial review of a final decision of the Commissioner denying her application for Supplemental Social Security Income (SSI) under Title XVI of the Social Security Act (the Act), 42 U. S. C. § 1381, *et seq*. and 405(g).  Pending are briefs on the merits filed by both parties (Docket Nos. 17 & 19).  For the reasons set forth below, the Magistrate affirms the decision of the Commissioner.

## I. PROCEDURAL BACKGROUND

The earliest administrative decision pertaining to Plaintiff's prior disability claims is an unfavorable decision dated December 3, 2007.  On July 14, 2004, Plaintiff filed for disability insurance benefits (DIB) and SSI alleging disability beginning March 1, 2003.  Both claims were initially denied on September 24, 2004, and upon reconsideration on January 25, 2005.  After making a timely written request, a hearing was held on October 9, 2007, before Administrative Law Judge (hereinafter "ALJ")

Denise McDuffie Martin.  On December 3, 2007, ALJ Martin issued her unfavorable decision determining, in relevant part, that Plaintiff did not have an impairment or combination of impairments that met or equaled one of the listed impairments; that she had the residual functional capacity to perform sedentary work with restrictions, that Plaintiff was capable of performing past relevant work; and that jobs existed in significant numbers in the national and local economy which Plaintiff was capable of performing (Docket No. 11, pp. 68-79 of 553).

On December 28, 2007, Plaintiff protectively filed an application for disability benefits and SSI alleging disability beginning December 4, 2007.  The claims were both initially denied on June 4, 2008, and upon reconsideration on October 15, 2008.  An administrative hearing was held on February 9, 2010, before ALJ Addison C.S. Masengill and on March 11, 2010, ALJ Masengill issued an unfavorable decision determining, in relevant part, that Plaintiff did not have an impairment or combination of impairments that medically equaled a listing; that she was unable to perform any past relevant work, but she was capable of making a successful adjustment to other work including representative sedentary and unskilled occupations that were prevalent in the national economy (Docket No. 11, pp. 87-96 of 553).

On May 18, 2010, Plaintiff applied for SSI and any federally administered State supplementation under Title XVI, alleging disability beginning on March 1, 2003[1] (Docket No. 11, pp. 201 of 553).  Plaintiff's claim was denied on August 19, 2010, and upon reconsideration on December 17, 2010 (Docket No. 11, pp. 142; 148 of 553).  On April 20, 2012, ALJ John R. Allen conducted a video hearing at which Plaintiff, represented by counsel, Emily Gilbert, and Vocational Expert George

---

[1]
The onset date was amended to May 2010 by ALJ Allen at the hearing held on April 20, 2012 (Docket No. 11, pp. 32 of 553).  The ALJ's decision also references a filing date of May 3, 2010, however; the Application Summary For Supplemental Security Income, notes a filing date of May 18, 2010 (Docket No. 11, pp. 14; 201 of 553).

2

W. Coleman, III, (hereinafter "VE Coleman") testified.  The ALJ and VE were located in Columbus with Plaintiff and her attorney participating from Mansfield, Ohio (Docket No. 11, pp. 32 of 553).  The ALJ issued an unfavorable decision on May 4, 2012 (Docket No. 11, pp. 11; 14 of 553).  The Appeals Council denied review of the ALJ's decision on May 30, 2013, thus rendering the ALJ's decision the final decision of the Commissioner (Docket No. 11, pp. 5 of 553).

## II. FACTUAL BACKGROUND

**A.    PLAINTIFF'S TESTIMONY**

Plaintiff testified that she is 42 years of age and single, has a 21 year old son and has custody of her minor niece and her niece's brother (hereinafter "the children"), all of whom live with her (Docket No. 11, pp. 37-38 of 553).  She has a driver's license, but no car, and reported driving once a month.  Plaintiff's educational history includes high school, some college, but she has not completed a college degree (Docket No. 11, pp. 38 of 553).  According to Plaintiff, she has not worked since May 2010, because she is unable to sit or stand for long periods of time, cannot lift more than three to five pounds at a time, and suffers from pain, numbness, and tingling in her legs, hips, knees and back[2] (Docket No. 11, pp. 41; 50 of 553).  She also noted numbness in her right hand (Docket No. 11, pp. 42 of 553).

Plaintiff is diabetic, takes Metformin and another unidentified drug to manage her diabetes and indicated to the ALJ that her doctors are still trying to determine whether the pain, numbness and tingling she suffers from is related to her diabetes (Docket No. 11, pp. 42 of 553).  Plaintiff has monthly appointments with  Dr. Siraj A. Siddiqui to monitor her diabetes and for prescription refills.  She also

---

[2]

During her testimony, the ALJ asked Plaintiff if she had worked since May 2010.  Plaintiff indicated that she had not (Docket No. 11, pp. 41 of 553).  Elsewhere in the record, it is noted that Plaintiff has not worked since sometime in 2003. *See* (Docket No. 11, pp.420 of 553).

reported seeing Dr. James R. Wolfe (Docket No. 11, pp. 43 of 553).  Plaintiff testified that her medications ease her symptoms and make it possible for her to make it through the day, but have side effects that make her feel groggy and tired (Docket No. 11, pp. 43 of 553).

Plaintiff also testified that she suffers from migraine headaches at least three to four times a week.  She takes medication when the migraines occur, explaining that she sometimes shuts off the lights and covers her face with a towel to help alleviate the symptoms.  She noted that the medication eases her symptoms about an hour after taking it (Docket No. 11, pp. 43-44 of 553).

Plaintiff described her back pain as moving from her back into her legs and causing numbness in her feet.  She analogized the pain as feeling like someone is kicking her in the back with a combat boot.  Plaintiff noted that the pain was constant, never goes away, and sometimes intensifies leaving her unable to move.  She reported having back spasms, which last between three and fifteen minutes in duration and cause her to shake.  Plaintiff explained that standing and lying wrong really irritates her back (Docket No. 11, pp. 43-45 of 553).

Plaintiff reported walking with the assistance of a cane, being able to sit between 30 minutes and 60 minutes before the pain requires her to adjust her body's positioning. She indicated that she can be on her feet for a maximum of ten minutes, and is unable to lift more than five pounds without feeling a strain in her back and hips (Docket No. 11, pp. 45-46 of 553).

In addition to her physical limitations, Plaintiff described her mental issues.  She reported being depressed and feeling worthless because she cannot perform normal or household jobs and relies on her family to help cook, wash clothes, and assist her with putting on her shoes. Plaintiff also described having difficulty concentrating because her mind wanders (Docket No. 11, pp. 46-47 of 553).  She informed the ALJ that she reads a lot, explaining that she used to read a book a night, but since experiencing the concentration difficulties that same reading might now take a week (Docket No. 11,

pp. 47; 49; 52 of 553).  Plaintiff indicated that other than reading, she plays a handheld Yahtzee video game, and does not watch much television (Docket No. 11, pp. 47 of 553).  When asked about her typical day, Plaintiff described waking up, getting the kids off to school, and the four-hour process she undertakes to get ready if she has to leave the house for an appointment. Plaintiff noted that she attends therapy three days a week (Docket No. 11, pp. 48 of 553).

Plaintiff testified that she gets along with everyone, receives phone calls and visits from friends, and spends the majority of her time at home (Docket No. 11, pp. 47 of 553).  In addition to reading, her hobbies include attending church where she serves as a youth leader, and playing the Candy Land board game with her niece when she comes home from school.  Plaintiff noted that the only other activities she attends outside of the house are her children's school programs or back-to-school luncheons (Docket No. 11, pp. 49 of 553).

With respect to household chores, Plaintiff indicated that when she cooks she does so with the assistance of the children who enjoy participating in the preparation activities (Docket No. 11, pp. 49-50 of 553).  With respect to bathing, Plaintiff noted it takes a significant amount of time to shower and that she utilizes a chair in the bathtub.  She indicated that she has difficulties completing tasks that require her to bend over (Docket No. 11, pp. 51 of 553).

Plaintiff indicated that physically, her good and bad days are basically the same. She noted that on a good day she might cook and fold clothing.  She indicated that the periodic numbness she experiences in her right hand causes her to favor her left hand because when the numbness hits, she has dropped items carried in her right hand.  Plaintiff also described the affect her medications have on her daily routine, noting that after taking them, she will sleep 30 to 60 minutes.  She noted difficulty sleeping at night, explaining that the pain causes her to toss and turn.  Plaintiff also testified that she experiences daily swelling in her knees, a tingling sensation in her toes, and numbness within 20

minutes of waking up.  To reduce swelling, Plaintiff lies flat and elevates her feet.  She indicated that she must elevate her feet at least once an hour for 15 to 20 minutes (Docket No. 11, pp. 52-55 of 538).

Plaintiff also described the affects her depression has on her daily life indicating that she cries on a daily basis.  She testified that the kids make her happy and that she does not cry in front of them, instead waiting until she is sleeping or when the kids are away from the house.  Plaintiff indicated that she sees Dr. Siddiqui for treatment of her mental issues, but does not otherwise see a psychiatrist because her insurance will not pay for it.  She also noted that she had attended counseling before applying for Social Security benefits back in 2010 (Docket No. 11, pp. 55-57 of 553).

**B.      VE TESTIMONY**

Having familiarized himself with Plaintiff's file and vocational background before the hearing, VE Coleman characterized Plaintiff's past work experience as a protective signal operator, a semi-skilled and sedentary job; assistant manager at a photo lab, a skill job with a specific vocational preparation[3] (hereinafter SVP) level of 6, a light exertional level; and a latch-key teacher at a daycare, semi-skilled, light exertional (Docket No. 11, 39-41 of 553).

ALJ Allen posed his first hypothetical question to VE Coleman:

Let me ask you to assume we have an individual of the claimant's age, education, with the past work experience.  That individual is capable of the performance of unskilled, simple, repetitive tasks . . . except that she cannot work at heights or use ropes, ladders or scaffolds . . . cannot work around dangerous machinery.  Limited to no more than occasional use of ramps or stairs . . . stooping, crouching, crawling, kneeling.  No more than incidental exposure to extremes of cold, [heat], humidity, vibration, fumes, dust or gases.  No tasks involving the operation of foot or leg controls.  No overhead lifting or reaching.  Within those limitations . . . is there work for such an individual?

---

[3]

SVP is the amount of lapsed time required by a typical worker to learn the techniques, acquire the information, and develop the facility needed for average performance in a specific job-worker situation. www.onetonlne.org.  SVP is a component of Worker Characteristics information found in the Dictionary of Occupational Titles (DOT), a publication that provides universal classifications of occupational definitions and how the occupations are performed.  www.occupationalinfo.org.

(Docket No. 11, pp. 58 of 553).

After considering these limitations, the VE answered that consistent with the DOT descriptions, there would be work available for such an individual.  The first job VE Coleman noted was that of charge account clerk, which he described as an unskilled job with a SVP of 2 and a sedentary strength rating.  He detailed the prevalence of the job in the work force testifying that there are 70 such jobs in the Mansfield region, 8,240 in the State of Ohio, and 204,730 in the United States.  The next job VE Coleman provided was that of food and beverage order clerk, an unskilled job with a SVP of 2 and a sedentary strength rating.  He noted 90 of these jobs in the Mansfield region, 8,450 in the State of Ohio, and 211,370 in the nation.  The third and final job VE Coleman provided was that of  addresser or address clerk, which he noted is an unskilled job with a SVP of 2 and of a sedentary strength rating (Docket No. 11, pp. 59-60 of 553).

ALJ Allen followed up his first hypothetical by asking whether having the limitations described by Dr. Siddiqui in Exhibit 10-F would change VE Coleman's response.  VE Colman indicated that the number of "poor marks" in all essential functions of unskilled work would be work-preclusive at a competitive Substantial Gainful Activity (SGA) level.  ALJ Allen posed another follow up question to VE Coleman, asking whether the first hypothetical would preclude Plaintiff from her past work?  VE Coleman indicated that the first hypothetical would be work preclusive because Plaintiff has no unskilled work history (Docket No. 11, pp. 60 of 553).

ALJ Allen requested that VE Coleman revisit ALJ Allen's first hypothetical:

> . . . if I assume the first hypothetical but further ask you to assume that because of exacerbation of symptoms, the individual might miss three to five days a month due to either pain or depressive symptoms . . . would that change your response?

(Docket No. 11, pp. 61 of 553).  VE Coleman noted that his answer to the first hypothetical would

change because three to five absences per month is an undue burden on an employer given that the acceptable absenteeism for unskilled or semi-skilled work settings is four to eight hours per month (Docket No. 11, pp. 61 of 553).

On cross-examination, Plaintiff's counsel asked VE Coleman to revisit ALJ Allen's first hypothetical and added the requirement that the hypothetical individual be able to sit, stand, and walk as necessary to relive symptoms and asked if the hypothetical individual would still be able to perform the aforementioned jobs?  VE Coleman noted that the sit-and-stand variance is not specifically addressed in the DOT, but explained that, based upon his experience in the labor market, the stand/sit option would be permissible in certain unskilled, sedentary work settings, but cautioned that standing or moving around in a sedentary work setting is likely to take the hypothetical individual  away from their job tasks, and depending upon the frequency it could prevent the hypothetical individual from performing the job task at an SGA level.  VE Colman noted that such a limitation, depending upon the frequency, would place an undue burden on the employer to the extent the hypothetical individual could not perform the essential functions of the job (Docket No. 11, pp. 61-63 of 553).

**C.**    **MEDICAL EVIDENCE**

In Plaintiff's application for SSI, she alleges an onset date of March 1, 2003.  The medical records contained in the case record date back to March 2003.  The undersigned Magistrate notes two prior administrative decisions concerning disability benefits which are respectively dated December 3, 2007 and March 11, 2010.  Since those cases are final, the undersigned notes that the earliest date Plaintiff would be eligible for benefits is May 18, 2010, the date her application was filed.  While all of the medical records in the case record have been reviewed by the undersigned, summaries are included only for those records which are relevant to the instant claim.

**1.**    **INPATIENT HOSPITAL RECORDS - MEDCENTRAL HEALTH SYSTEM - MANSFIELD,**

**OHIO**

- On June 7, 2011, Plaintiff visited the Emergency Department (hereinafter "ED") and complained of a headache and lumps on her head.  Diagnosed with an acute migraine headache and scalp abscess, the attending physician drained the abscess and prescribed an anti-biotic and pain medication (Docket No. 11, pp. 520-534 of 553).

- On July 5, 2011, Plaintiff visited the ED complaining of sudden onset center lower back pain which went into her hips and groin.  She reported that the pain was consistent, severe, sharp, and rated her pain level 10 out of 10.  The differential diagnosis indicated strain/sprain, and herniated disc.  The record indicates that Plaintiff underwent a CT scan, provided blood and urine for analysis and was given pain medication (Docket No. 11, pp. 482-510 of 553).

- On December 29, 2011, Plaintiff presented to the ED complaining of left hip and back pain.  Upon physical examination, pain and nausea medications were prescribed and Plaintiff was referred to Dr. James Wolfe, M.D. (Docket No. 11, pp. 468-479 of 553).

**2.    LABORATORY AND RADIOLOGY REPORTS - MEDCENTRAL HEALTH SYSTEM**

The record also includes a number of laboratory reports, which are summarized as follows to

the extent they are relevant to the instant claim:

- The record contains four Hemodynamic Status Reports, dated January 26, February 23, March 23, and June 8, 2011.  Each report details the testing results for 18 variables (Docket No. 11, pp. 459-462 of 553).

- On June 8, 2011, results from the Antinuclear Antibody test performed by the Mayo Clinic Department of Laboratory Medicine and Pathology were negative for abnormality (Docket No. 11, pp. 455 of 553).  The results from the Rheumatoid Factor blood test were negative for an abnormal amount of RF antibodies in the blood (Docket No. 11, p. 456 of 553).

- On July 5, 2011, a Laboratory Report reflects hematology and general chemistry results of blood and urine analysis (Docket No. 11, pp. 492-496 of 553).

- On July 6, 2011, a report concerning Plaintiff's CT scan noted finding no kidney stones, no hydronephrosis[4] and a normal appendix (Docket No. 11, pp. 498-500; 502 of 553).

---

[4]

Hydronephrosis is literally water inside the kidney or kidney swelling due caused by a backup of urine.  *Kidney Pain Causes-Symptoms*, MAYO CLINIC (Mar. 24, 2014, 10:33 AM), http://www.mayoclinic.org/symptoms/kidney-pain/basics/causes/sym-20050902.

9

- On November 8, 2011, Plaintiff complained of low back, bilateral hip, lower extremity pain, and foot numbness.  The Express Imagining Radiology Report noted that Dr. Wolfe ordered X-rays of Plaintiff's lumbar spine and the Interpreting Physician Dr. Kevin Hill, M.D., noted Levoconvex curviture of the lumbar spine, mild disc space narrowing at L5-S1, tiny marginal osteophytes[5] at the vertebral body endplates, and no spondylosis or spondylolisthesis[6] (Docket No. 11, pp. 480 of 553).

### 3.    DR. SIRAJ A. SIDDIQUI, M.D.

A Medical Questionnaire completed by Dr. Siddiqui and dated July 8, 2010, notes that Dr. Siddiqui initially treated Plaintiff from March 27, 2003, through November 10, 2009.  Dr. Siddiqui's diagnosis for Plaintiff includes asthma, anxiety, lumbar spine disc degeneration (LSDD),[7] obstructive sleep apnea (OSA),[8] migraine headaches, narcolepsy, seasonal allergic rhinitis (SAR), and type II diabetes mellitus (DM-II). (Docket No. 11, pp. 385-386 of 553).

### a.    PATIENT TREATMENT RECORDS

The record contains office treatment records for 25 visits Plaintiff made to see Dr. Siddiqui between January 2009 and March 2012.   These handwritten records, some of which include illegible notations, are summarized as follows:

- On January 13, 2009, Plaintiff presented for a check-up, medication refills and completion of paperwork.  While Dr. Siddiqui's handwriting is unclear, it appears that

---

[5]

Osteophytes are bone spurs, which are "bony projections that develop along the edges of the bones."  *Bone Spurs Definition-Diseases and Conditions*, MAYO CLINIC (Mar. 24, 2014, 10:54 AM), http://www.mayoclinic.org/diseases-conditions/bone-spurs/basics/definition/con-20024478.

[6]

Spondylolisthesis is a "condition in which a bone (vertebra) in the spine slips out of the proper position onto the bone below it." *Spondylolisthesis: MedlinePlus Medical Encyclopedia*, NATIONAL INSTITUTES OF HEALTH (Mar. 24, 2014, 10:46 AM), http://www nlm nih.gov/medlineplus/ency/article/001260 htm.

[7]

Throughout the treatment notes, Dr. Siddiqui lists "LSDD," among Plaintiff's conditions and it appears that LSDD references lumbar spine disc degeneration or Lumbar Disc Degeneration Disease (LDDD) or Disc Degeneration Disease (DDD).  Http://www.spine-health.com/conditions/degenerative-disc-disease-ddd.

[8]

*Obstructive Sleep Apnea Syndrome (OSA): Causes, Symptoms, Treatments, and More*, WEBMD, (Mar. 24, 2014, 11:10 AM), http://www.webmd.com/sleep-disorders/guide/understanding-obstructive-sleep-apnea-syndrome.

Dr. Siddiqui noted tenderness in Plaintiff' right knee and back, migraine headaches, anxiety, asthma, right foot pain, right knee pain, LSDD, OSA and possible sleep apnea. The treatment plan documents prescribing Phenergan-Codeine,[9] Tylenol, Ativan 1 mg,[10] and Floricet[11] (Docket No. 11, pp. 451 of 553).

- On February 10, 2009, Plaintiff presented for a check up, medication refills, a B-12 shot, and an x-ray of her right foot.  Dr. Siddiqui gave Plaintiff prescriptions for Ativan 1 mg, Tylenol #3, and Floricet (Docket No. 11, pp. 450 of 553).

- On March 23, 2009, Plaintiff complained of sinus problems and she requested a B-12 shot.  In addition to her typical impairments, Plaintiff was diagnosed with acute tracheobronchitis.  Refills were given for Ativan, Tylenol #3, and Floricet (Docket No. 11, pp. 449 of 553).

- On April 20, 2009, Plaintiff complained that the pain in her back was an eight out of ten; that her face was numb, and that she had experienced chest pains and mild pressures.  Her assessment contained notes of gastroesophageal reflux disease (GERD). Refills for Tylenol #3, Floricet, Ativan, Lidoderm patch,[12] Skelaxin,[13] and Nexium[14] were given and Plaintiff received a B-12 shot (Docket No. 1, pp. 448 of 553).

- On May 18, 2009, Plaintiff presented for follow up care and medication refills.  Plaintiff complained that the allergy pill was not working and that after eight hours she had drainage in her throat, causing her to cough and to use her breathing machine.  Plaintiff was given a B-12 shot and prescribed refills for Tylenol #3, Floricet, Ativan, and

---

[9]

Phenergan-Codeine is generally used to treat symptoms associated with allergies, the flu, and common cold. PHYSICIANS' DESK REFERENCE, 2006 WL 390485 (2006).

[10]

Ativan is used to treat anxiety, anxiety with depression and insomnia. *Ativan Oral:  Uses, Side Effects, Interactions, Pictures, Warnings & Dosing,* WEBMD, (Mar 24, 2014, 11:30 AM), http://www.webmd.com/drugs/drug-6685-Ativan+Oral.aspx?drugid=6685&drugname=Ativan+Oral.

[11]

Floricet is used to treat tension headaches.  *Floricet oral: Uses, Side Effects, Interactions, Pictures, Warnings & Dosing*, WEBMD, (Mar. 24, 2014, 11:34 AM), http://www.webmd.com/drugs/drug-15869-fioricet+oral.aspx.

[12]

Lidoderm is a local anesthetic. *Lidoderm top:  Uses, Side Effects, Interactions, Pictures, Warnings & Dosing*, WEBMD, (Mar. 24, 2014, 11:43 AM), http://www.webmd.com/drugs/drug-17549-lidoderm+top.aspx.

[13]

Skelaxin is prescribed to relief discomfort associated with painful musculoskeletal conditions. *Skelaxin (Metaxalone) Drug Information: Indications, Dosage and How Supplied-Prescribing Info*, RXLIST, (Mar. 24, 2014, 11:47 AM), http://www.rxlist.com/skelaxin-drug/indications-dosage htm.

[14]

Nexium is taken to relieve persistent heartburn pain caused by gastroesophageal reflux disease. PHYSICIANS' DESK REFERENCE, 2006 WL 355252 (2006).

Adipex-P[15] (Docket No. 11, pp. 446 of 553).

- On June 22, 2009, Plaintiff presented for a check up, prescription refills, and a B-12 shot. Plaintiff complained of back and leg pain which she rated at a six out of ten. She was given a B-12 shot and refills for Tylenol #3, Floricet, Ativan, and Adipex-P (Docket No. 11, pp. 447 of 553).

- On August 11, 2009, Plaintiff complained that her right leg hurt; that she had some difficulty with her left leg; and that one of her medications was causing her cramps. The assessment in the record noted a generalized anxiety disorder (GAD). A B-12 shot was administered and Plaintiff was given refills for Floricet, Tylenol #3, and Ativan (Docket No. 11, pp. 445 of 553).

- On September 14, 2009, Plaintiff presented for a check up, medication refills and a B-12 shot. Plaintiff rated the pain in her back and legs as a 12 out of 10. She was given refills for Ativan, Floricet, and Tylenol #3 (Docket No. 11, pp. 444 of 553).

- On October 13, 2009, Plaintiff complained of a cold, cough and a severe migraine headache. Plaintiff was given a B-12 shot and refills for Ativan, Floricet, Tylenol #3, and Phenergan-Codeine (Docket No. 11, pp. 443 of 553).

- On November 10, 2009, Plaintiff complained of swollen glands, a sore throat, headache, and possible ear infection. She was given a B-12 injection and her prescriptions for Ativan, Zanaflex,[16] Tylenol, and Floricet were refilled (Docket No. 11, pp. 442 of 553).

- On May 17, 2010, Plaintiff visited Dr. Siddiqui complaining that the pain in her back, hip, and legs had started on Saturday. She described the pain as a six in severity.[17] Plaintiff was given a B-12 injection and refills for Ativan, Zanaflex, Floricet, Tylenol #3, "Epypen," and Nitroquick[18] (Docket No. 11, pp. 441 of 553).

---

[15]

Adipex-P is a weight loss drug. Adipex-P oral: Uses, Side Effects, Interactions, Pictures, Warnings & Dosing, WebMD, (Mar. 24, 2014, 11:54 AM), http://www.webmd.com/drugs/drug-4899-Adipex-P+Oral.aspx?drugid=4899.

[16]

Zanaflex is prescribed to threat muscle spasms. www/drugs.com/zanaflex html.

[17]

The record pertaining to this doctor visit contains a date which is partially cut off. After careful review, it appears the number that has been cut off is a 5.

[18]

Nitroquick is used for chest pain. NitroQuick sublingual: Uses, Side Effects, Interactions, Pictures, Warnings & Dosing, WEBMD, (Mar. 24, 2014, 12:08 PM), http:www.webmd.com/drugs/drug-16790-NitroQuick%20SL.aspx?drugid=16790.

- On September 15, 2010, Plaintiff complained that her sinus and back pain was severe and that she had experienced blisters on her hands, and ears after a Toradol shot and that she needed an antibiotic for her sinus infection.  A B-12 injection was administered and her medications:  Ativan, Zanaflex, Ambien, Floricet, Tylenol #3, and Diflucan[19] were refilled (Docket No. 11, pp. 440 of 553).

- On October 13, 2010, Plaintiff presented for a checkup and medication refills.  Plaintiff noted pain all over her body and rated it a ten out of ten.  Refills of Ativan, Zanaflex, Ambien, Floricet, Tylenol #3, and Diflucan were given as well as a B-12 shot (Docket No. 11, pp. 439 of 553).

- On November 30, 2010, Plaintiff requested refills for her medications and an aid for dry skin.  Plaintiff complained that her full body pain was a ten out of ten.  The medications Symbicort,[20] Zanaflex, Ativan, Floricet, Tylenol #3, and Ambien were noted in the record as well as a notation that she received a B-12 injection (Docket No. 11, pp. 438 of 553).

- On December 29, 2010, Plaintiff complained of left hip pain and requested a B-Complex shot.  Plaintiff's pain in her left hip was noted as a ten out of ten.  Refills were given for Ativan, Tylenol #3, Ambien, Floricet, and Zanaflex, as well as a B-12 shot (Docket No. 11, pp. 437 of 553).

- On January 26, 2011, Plaintiff complained of left hip pain and numbness and frequent heart burn.  She was given a prescription for Prilosec, refills of Zanaflex, Floricet, Tylenol #3, and Ativan, and a B-12 shot (Docket No. 11, pp. 436 of 553).

- On February 23, 2011, Plaintiff complained of back pain and rated it at nine and one-half out of ten.  Refills for Ativan, Tylenol #3, Floricet, and Zanaflex were given as well as a B-12 shot (Docket No. 11, pp. 435 of 553).

- On March 23, 2011, Plaintiff complained of a sore throat.  She was diagnosed with acute pharyngitis and given a Z-pack and a B-12 shot.  Prescriptions for Ativan, Tylenol #3, Floricet and Zanaflex were renewed (Docket No. 11, pp. 434 of 553).

- On May 25, 2011, Plaintiff requested and was given a B-12 shot and medication refills for Zanaflex, Ativan and Floricet (Docket No. 11, pp. 433 of 553).

- On June 8, 2011, Plaintiff was concerned that she had a laceration in her head, not a

---

[19]

Diflucan is an antifungal agent. *Difulcan (Fluconazole) Drug Information: Description, User Reviews, Drug Side Effects, Interact*, RxLIST, (Mar. 24, 2014, 12:14 PM), http://www.rxlist.com/diflucan-drug.htm.

[20]

Symbicort is used to treat and prevent asthma attacks and chronic obstructive pulmonary disease. *Symbicort (Budesonide and Formoterol Fumerate Dihydrate) Drug Information: Indications, Dosage, RxList*, (Mar. 24, 2014, 12:18 PM), http://www.rxlist.com/symbicort-drug/indications-dosage.htm.

boil, made by MedCentral ER.  Diagnosed with cellulitis[21] scalp, Tetracycline, a medication used to treat bacterial infections, was prescribed (Docket No. 11, pp. 432 of 553).

- On June 13, 2011, Plaintiff presented to review test results.  The assessment indicates new onset type II diabetes, obesity, and scalp cellulitis.  The additional notations are not decipherable (Docket No. 11, pp. 431 of 553).

- On August 17, 2011, Plaintiff requested medication refills, noting that her lower back and head pain was severe.  Refills for Floricet, Ativan, Zanafex, and Tylenol #3 and Plaintiff was referred to a pain management specialist (Docket No. 11, pp. 430 of 553).

- On January 5, 2012, Plaintiff complained of sinus drainage, coughing up mucus and left hip and leg pain.  Plaintiff requested a B-12 shot, something other than Tetracycline because the pharmacy could not get it and a prescription for a lift chair and a shower chair.  Plaintiff was referred to Dr. Wolfe and given refills for Zanaflex, Floricet, and Ativan (Docket No. 11, pp. 467 of 553).

- On February 9, 2012, Plaintiff was given a B-12 injection and refills for Zanaflex, Floricet and Ativan (Docket No. 11, pp. 466 of 553).

- On March 13, 2012, Plaintiff requested medication refills, an order for a bath tub chair, nebulizer, B-12 shot, antibiotic shot, and Brovana, a medication used to treat breathing problems, commenting that it helped a lot when she had the treatments in the office.  The medications Floricet, Ativan, and Zanaflex were continued (Docket No. 11, pp. 465 of 553).

### b.    PHYSICAL FUNCTIONAL CAPACITY ASSESSMENT & DISABILITY FORMS

Dr. Siddiqui also completed two forms for Richland County Job and Family Services pertaining to Plaintiff's medication dependencies and medical history.  While the first form does not contain a date of completion, the form does reflect that his last examination of Plaintiff prior to completing the form was on January 13, 2009.  The form notes Plaintiff's medical conditions as a Bipolar disorder, Depression, GAD, asthma, migraine headaches, bilateral knee DJD, lumbar scoliosis, OSA, and

---

[21]

  Cellulitis is a bacterial skin infection.  *See Cellulitis Definition - Diseases and Conditions*, MAYO CLINIC(Mar. 18, 2014, 11:36 AM), http://www.mayoclinic.org/diseases-conditions/cellulitis/basics/definition/con-20023471.

obesity. Dr. Siddiqui indicated that Plaintiff had suffered from theses conditions for many years. Plaintiff's medications were noted as Abilify 10 mg, Wellburtrin XL 300, Trazodone 150 , Floricet, Prilosec 20, Tylenol #3, Symbicort, and two additional medications which are illegible (Docket No. 11, pp. 452 of 553).

On another form for Richland County Job and Family Services, Dr. Siddiqui assessed Plaintiff's physical functional capacity for standing/walking, sitting, and lifting, noting that during an eight-hour shift, Plaintiff could stand/walk for approximately one hour without interruption and no more than one to two hours during the entire work day. Dr. Siddiqui indicated that Plaintiff could sit for up to three hours without interruption and for a total of four hours during a work day; lift/carry six to ten pounds frequently, meaning up to two-thirds of an eight hour work day; and carry up to five pounds occasionally. In assessing the Plaintiff's functional limitations, Dr. Siddiqui concluded that Plaintiff was "markedly limited" in the functions of pushing/pulling; bending; and reaching; "moderately limited" with respect to handling, and no significant limitations in seeing, hearing and speaking. Dr. Siddiqui did not provide a detailed narrative of observations and/or medical evidence to support his findings (Docket No. 11, pp. 454 of 553).

On January 5, 2012, Dr. Siddiqui also completed a form titled "Medical Source Statement: Patient's Mental Capacity" in which he noted in the category of "Making Occupational Adjustments," Plaintiff responded appropriately to changes in routine settings, but she responded poorly at maintaining attention and concentration for extended periods of two-hour segments. Dr. Siddiqui assessed Plaintiff as "poor" under each of the following attributes: using judgment; maintaining regular attendance and being punctual within customary tolerances; dealing with the public; relating to co-workers; interacting with supervisors; functioning independently without special supervision; working in coordination with or proximity to others without being unduly distracted or distracting; dealing with

15

work stresses; and completing a normal workday and work week without interruptions from psychologically based symptoms and performing at a consistent pace without an unreasonable number and length of rest periods (Docket No. 11, pp. 463-464 of 553).

Under the category of "Intellectual Functioning," Dr. Siddiqui assessed Plaintiff as "poor" under the attributes of understanding, remembering and carrying out complex job instructions; understanding, remembering and carrying out detailed, but not complex job instructions; and understanding, remembering and carrying out simple job instructions (Docket No. 11, pp. 464 of 553).  With respect to the final category, "Making Personal and Social Adjustment," Dr. Siddiqui noted Plaintiff as "fair" under the attributes of: maintaining appearance, but noted her as "poor" under the attributes of socializing; behaving in an emotionally stable manner; relating predictably in social situations; management of funds/schedules; and ability to leave home on own.  Otherwise, Dr. Siddiqui comments simply note that Plaintiff has Generalized Anxiety Disorder without further comment (Docket No. 11, pp. 464 of 553).

### 4.    DR. JAMES R. WOLFE, M.D.

On September 20, 2011, Plaintiff had a consultation with Dr. Wolfe who described Plaintiff as very pleasant and having presented herself with chronic mechanical lower backache aggravated by repetitive activity.  Dr. Wolfe considered Plaintiff's obesity, weight loss, knee pain, tingling, and numbness, past medical and surgical history, current list of medications, allergies, family and social history, review of symptoms, and the results of an objective examination.  With respect to the musculoskeletal examination, Dr. Wolfe noted that Plaintiff's lower back was clearly tender, aggravated by any range of motion; that her sacroiliac joints were tender, that the straight leg raising

tests elicit more back pain than leg pain; and that Plaintiff had severe crepitus[22] in her knees.  The neurological examination notes reflect Dr. Wolfe's findings that Plaintiff's motor and sensory functioning are not bad, but note that she may have some proprioceptive loss in the toes, and that deep tendon reflexes are symmetrically decreased at the quadriceps and Achilles (Docket No. 11, pp. 536-537 of 553).

Dr. Wolfe also reviewed a MRI of Plaintiff's knees from March 17, 2006, which showed the right knee had medial compartment arthritis and degeneration of the medial and lateral menisci.  The left knee was noted as showing tricompartmental arthritis with medial meniscus degeneration and chondromalacia.[23]  Dr. Wolfe noted that a MRI of Plaintiff's hips from January 31, 2005, was unremarkable and a MRI of the lumbar spine from the same date showed degenerative disc signal at L2-3 and L3-4 (Docket No. 11, pp. 537 of 553).

Dr. Wolfe's assessment further noted that Plaintiff had mechanical lower back pain/facet syndrome,[24] sacroiliac irritation,[25] hip bursitis, and end-stage knee osteoarthritis.  His plan described continuing medication, but noted Plaintiff's preference for a different approach.  Dr. Wolfe prescribed

---

[22]

Crepitus is a "peculiar crackling, crinkly, or grating feeling or sound under the skin, around the lungs, or in the joints." *Crepitus definition*, MEDICINENET.COM, (Mar. 25, 2014, 10:51 AM), http://www.medterms.com/script/main/art.asp?articlekey=12061.

[23]

Chrondromalacia is cartilage under the kneecap that acts as a natural shock absorber. *Chondromalacia patella Definition-Diseases and Conditions*, MAYO CLINIC (Mar. 25, 2014, 10:58 AM), http://www.mayoclinic.org/diseases-conditions/chondromalacia-patella/basics/definition/con-20025960.

[24]

Facet Syndrome "is a condition in which the joints in the back fo the spine degenerate and subsequently cause pain." Dr. Steven C. Ludwig, M.D., *What is Facet Syndrome?*, ABC NEWS, (Mar. 25, 2014, 11:01 AM), http://abcnews.go.com/Health/CommonPainProblems/story?id=4047870.

[25]

Sacroiliac Joints link the pelvis to the lower spine and are located in the right and left sides of the lower back. *Sacroiliac joints*, MAYO CLINIC, (Mar. 25, 2014, 11:04 AM), http://www.mayoclinic.org/diseases-conditions/sacroilitis/multimedia/sacroiliac-joints/img-20005962.

Tramadol and determined whether Plaintiff could tolerate anti-inflammatory drugs.  He also indicated that Plaintiff would start physical therapy on her back, noting that it was still a major complaint.  Dr. Wolfe commented that if Plaintiff does not respond to therapy, she will be given an updated MRI to decide whether injections are appropriate or whether a surgical consultation should be considered (Docket No. 11, pp. 537 of 553).

On October 12, 2011, Plaintiff returned to Dr. Wolfe for a follow-up examination after she had started physical therapy.  Dr. Wolfe noted that although the Tramadol medication made her a little sick, Plaintiff should continue to take it and he would add an anti-inflammatory medication.  Plaintiff's symptoms were described as musculoskeletal and consisting of a lower backache and back and knee tenderness.  Dr. Wolfe diagnosed Plaintiff with lumbar spondylosis with facet arthritis and determined that the likely course of treatment was injections, but indicated he would order an MRI first.  Dr. Wolfe indicated that he had asked Plaintiff to continue therapy for a while longer before making a decision and he prescribed Vimovo[26] (Docket No. 11, pp. 538 of 553).

On November 10, 2011, Dr. Wolfe concluded that Plaintiff had made some progress with her therapy; that she was using minimal medication; and that diagnostic imaging showed spondylosis and degenerative disc disease.  Plaintiff's back was mildly tender with extension, but straight leg raises were negative for underlying disease.  Although she had painful lumbar facet arthritis, Dr. Wolfe deferred a decision regarding the injections pending further therapy and enhanced her drug regimen (Docket No. 11, pp. 539 of 553).

### 5. PHYSICAL THERAPY - SUMMIT THERAPY & PERFORMANCE CENTER

---

[26]

Vimovo helps protect the stomach from ulcers while it treats pain caused by arthritis or spondylitis. *Vimovo oral: Uses, Side Effects, Interactions, Pictures, Warnings & Dosing*, WEBMD, (Mar. 26, 2014, 10:36 AM), http://www.webmd.com/drugs/drug-154108-Vimovo+Oral.aspx?drugid=154108&.

During Plaintiff's initial evaluation at Summit Therapy & Performance Center on September 28, 2011, the record noted her lower back pain, hip, thigh, and knee pain.  The physical therapist suggested that Plaintiff had impaired joint mobility, motor function, muscle performance, range of motion and reflex integrity associated by spinal disorders.  The current functional limitations were affected by high pain levels; gait impairment affecting prior level of community and social activities; and difficulty with Activities of Daily Living (ADL) (bathing, dressing, grooming).  The therapy goals included a plan to reduce Plaintiff's pain to a 6/10 from 10/10.  Plaintiff attended 44 therapy sessions between September 30, 2011 and March 28, 2012 (Docket No. 11, pp. 540-542; 543-553 of 553).

**D.     AGENCY EVALUATIONS**

**1.     DR. BRETT TOWARD, M.D.**

On May 5, 2010, Plaintiff was examined by Dr. Toward, a specialist in family medicine, at the request of Job and Family Services.  He outlined Plaintiff's medical history, pain issues, past work history, and conducted a physical examination.  Dr. Toward acknowledged Plaintiff's current medical problems as intrinsic asthma, lumbago, and diabetes mellitus type II-uncomplicated controlled.  He concluded that Plaintiff's asthma was controlled with medication; and that Plaintiff had moderate limitations due to subjective back pain, partially temporary since Plaintiff was not undergoing treatment (Docket No. 11, pp. 420-421 of 553).

Dr. Toward recounted several of Plaintiff's comments made during her examination, notably:

. . . has not worked since 2003. [W]as a manager at a photo studio . . . [S]tates she could still do this type of work she feels although she states several times that [SSI] told her she can't any longer. [H]as not tried to work since then as she has been waiting on [SSI] to tell her what she can do and she has not needed to since she had a child at home under 18 until last fall. [O]nce he turned 18 she lost her welfare eligibility. [D]oes all her own adl's and house work. [S]tates there is no reason [she] could not do desk work or light types of work that didn't require lifting or bending."

(Docket No. 11, pp. 420 of 553).  Dr. Toward concluded that Plaintiff is "employable for class 0-1, 2

19

with restrictions" (Docket No. 11, pp. 421 of 553).

### 2. DR. AARON R. BECKER, PSY. D.

On May 11, 2010, Psychologist Dr. Becker, conducted an assessment at the request of Richland County Job and Family Services. Summarizing Plaintiff's background, educational, and work history, Becker concluded that Plaintiff was upset with her life circumstances, noting her injury on the job, the death of her parents, fiancé, and 33 friends and family between December 2003 and June 2009. Plaintiff claimed to have a low energy level, chronic pain, sleep difficulties and crying episodes. She indicated she enjoys church activities and working with her youth group (Docket No. 11, pp. 424-425 of 553). Plaintiff further explained that she applied for disability benefits because she was hurt at work; she was born with spina bifida; she was diagnosed with depression by Dr. Siddiqui in 2004; she had previously taken Ativan and Wellbutrin to control her depressive symptoms but was not taking any psychotropic medications because she had no medical coverage; and she participated in some counseling and psychotherapy after her parents died, which she described as helpful (Docket No. 11, pp. 424 of 553).

Plaintiff described her past work history including jobs at the Sears Photo Center, Marco Photo, Fuji True Color, and Vector Security. Prior to her injury, she worked two jobs for several years. Plaintiff did not report drug or alcohol abuse or dependency and she had no history of legal involvement (Docket No. 11, pp. 425-426 of 553).

Dr. Becker's clinical observations and assessment of Plaintiff's mental status described her as morbidly obese, of depressed mood and affect who was tearful and crying through her clinical interview. Plaintiff denied suicidal or homicidal ideations citing her religious beliefs and Dr. Becker noted no evidence of hallucinations or delusions. Plaintiff's speech was normal in rate and coherent and Dr. Becker concluded that word usage and graduation from high school suggests that Plaintiff is

functioning within the average range of intellect.  He diagnosed Plaintiff with a Major Depressive Disorder, Recurrent, Severe without Psychotic Features and he assessed her a Global Assessment of Functioning (GAF) score of 48[27] (Docket No. 11, pp. 426 of 553).

Dr. Becker concluded that without Social Security and medical benefits, Plaintiff's psychological symptoms are likely to continue, are severe enough to preclude her from employment, and suggested that she should be considered disabled and provided these benefits (Docket No. 11, pp. 427 of 553).  In addition to his narrative, Dr. Becker also completed a Mental Functional Capacity Assessment and noted that Plaintiff was markedly limited in her ability to carry out detailed instructions; maintain attention and concentration for extended periods; perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances; complete a normal workday and workweek without interruptions from psychologically based symptoms; and perform at a consistent pace without an unreasonable number and length of rest periods (Docket No. 11, pp. 428-429 of 553).

E.    AGENCY DETERMINATIONS

1.    INITIAL DISABILITY DETERMINATION - DR. DIMITRI TEAGUE, M.D.

In the Disability Determination Explanation Form, Dr. Teague considered the evidence of record, specifically, Plaintiff' statements; findings of fact and analysis of evidence; weighed the medical opinions of treating and non-treating medical sources; reviewed and assessed Plaintiff's residual functional capacity (hereinafter RFC) including vocational factors and concluded that Plaintiff

---

[27]

A Global Assessment of Functioning Score of 48 reflects "serious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) or any serious impairment in social, occupational or school functioning (e.g., no friends, unable to keep a job).  *Tinsley v. Astrue*, 2008 WL 4724494, *2 (W.D. Ky. 2008)(not reported)(*citing* AM. PSYCHIATRIC ASS'N DIAGNOSTIC & STATISTICAL MANUAL OF MENTAL DISORDERS, 4th Ed. ("DSM-IV"), *Global Assessment of Functioning scale*).

is not currently disabled (Docket No. 11, pp. 120-135 of 553).[28]  Dr. Teague noted that the medical evidence shows Plaintiff can think clearly, has degenerative changes in her spine, reduced movement in her back, occasional migraine headaches, asthma and she can move her extremities.  He noted that while Plaintiff has certain physical exceptions and is unable to work around fumes and environmental irritants, she is not precluded from all work (Docket No. 11, pp. 134-135 of 553).

### 2.   RECONSIDERATION OF DISABILITY DETERMINATION - DR. MARIA CONGBALAY, M.D.

Upon reconsideration of Plaintiff's disability determination, Dr. Maria Congbalay reviewed the disability determination assessment and concluded that Plaintiff is not disabled (Docket No. 11, pp. 116-117 of 553).  The completed Disability Determination Explanation Form reflects consideration of: the issues for reconsideration; evidence of record; findings of fact and analysis of evidence; analysis of medically determinable impairments and severity, including the PRT analysis of the opinions from treating and non-treating medical sources such as Dr. Vicki Warren, Ph.D.; and a review of Plaintiff's RFC including vocational factors (Docket No. 11, pp. 103-117 of 553).[29]

Dr. Congbalay also indicated that the evidence reflects degenerative changes in Plaintiff' spine, reduced movement in her back, and that she suffers from migraine headaches and asthma.  Despite her conditions, Dr. Congbalay noted that Plaintiff is not precluded from all work (Docket No. 11, pp. 116-117 of 553).

### III.  STANDARD OF DISABILITY

---

[28]

    Among the evidence reviewed was a Psychiatric Review Technique Assessment (PRT) by Psychologist Dr. Todd Finnerty, Psy. D., which noted adoption of PRTF findings from ALJ Masengill's prior decision of December 3, 2007, and Mental RFC (MRFC) findings pursuant to SSAR 98-4.

[29]

    In her Psychiatric Review Technique Assessment, Dr. Vicki Warren, Ph.D., noted adoption of Psychiatric Review Technique Form (PRTF) findings from ALJ Masengill's prior decision of December 3, 2007, and the MRFC pursuant to SSAR 98-4.

The Social Security Act sets forth a five-step sequential evaluation process for determining whether an adult claimant is disabled under the Act. *See* 20 C.F.R. § 416.920(a) (West 2014); *Miller v. Comm'r Soc. Sec.*, 2014 WL 916945, *2 (N.D. Ohio 2014). The regulations describe the five-step sequential evaluation process as a "series of five 'steps' that [are followed] in a set order" 20 C.F.R. § 416.920(a)(4) (West 2014). All of the evidence relevant to the claim and contained in the case record is considered in making a determination whether an adult is disabled under the Act. *See* 20 C.F.R. §§ 416.920(a)(3) & 416.920b (West 2014).

At step one, the Commissioner must consider the claimant's work activity and whether any such work is substantial gainful activity (hereinafter SGA). 20 C.F.R. § 416.920(a)(4)(i) (West 2014). SGA is generally defined as work activity that involves significant physical or mental activities, even if done on a part time basis, usually for pay or profit. *See* 20 C.F.R. § 416.972 (West 2014). If the claimant is determined to have engaged in SGA, the claimant is not disabled regardless of the claimant's medical condition, age, education, and work experience. 20 C.F.R. § 416.920(a)(4)(1)(i) & (b) (West 2014). If the claimant has not engaged in SGA, the analysis proceeds to step two.

At step two, the Commissioner must consider whether the claimant has a medically determinable impairment or combination of impairments that is "severe" and meets the duration requirements under the regulations. 20 C.F.R. § 416.920(a)(4)(ii) (West 2014). A "severe" impairment or combination of impairments limits the claimant's physical or mental ability to do basic work activities. 20 C.F.R. § 416.920(c) (West 2014). The impairment must be expected to result in death or last for a continuous period of at least 12 months to satisfy the duration requirements. 20 C.F.R. § 416.909 (West 2014). If the claimant does not have a severe medically determinable impairment or combination of impairments, the claimant is not disabled. 20 C.F.R. § 416.920(a)(4)(ii) (West 2014). If the claimant has a severe impairment or combination of impairments, the analysis proceeds to the

23

third step.  *Id.*

At step three, the Commission must consider the medical severity of the impairment or combination of impairments to determine whether it meets or equals the listings set forth in 20 C.F.R. Part 404, Subpart P, Appendix 1.  *See* 20 C.F.R. § 416.920(d) (West 2014).  If the claimant's impairment or combination of impairments meets or equals the criteria of a listing and meets the duration requirements under the regulation, the claimant is disabled.  *Id.*  If the claimant does not, then the analysis proceeds to a determination concerning the claimant's RFC.  20 C.F.R. § 416.920(e) (West 2014).

A claimant's RFC is generally defined as the affect a claimant's impairment has on what the claimant is capable of doing, both mentally and physically, in a work setting.  20 C.F.R. § 416.945(a) (West 2014).  In other words, a claimant's RFC is "the most [the claimant] can still do despite [the claimant's] limitations." *Id.*  The regulations note that in making this determination, all impairments, including those that are not severe will be considered when assessing a claimant's RFC. 20 C.F.R. § 416.945(a)(2) (West 2014).  Under Social Security Acquiescence Rulings (hereinafter SSAR), a subsequent disability claim concerning an unadjudicated period, which arises under the same title of a previous claim, requires the adjudicator to adopt the previous findings by the ALJ or Appeals Council in determining whether the claimant is disabled, unless there is both new and material evidence relating to the previous determination, a change in the law, applicable regulations or rulings that affect the analysis or finding.  *See* SSAR 98-3(6) & 98-3(6).

The fourth step in the sequential analysis is to determine whether the claimant has the RFC to perform the requirements of the claimant's past relevant work. 20 C.F.R. § 416.920(e) (West 2014). Past relevant work is defined as work the claimant has done within the past 15 years (or 15 years prior to the date of the established disability), which was substantial gainful work, and lasted long enough

24

for the claimant to learn to do it.  20 C.F.R. §§ 416.960(b) & 416.965(a) (West 2014).  If a claimant's

impairment or combinations of impairments do not prevent the claimant from performing past work,

then the claimant is not disabled. 20 C.F.R. § 416.920(f) (West 2014).  If the claimant is unable to do

any past relevant work, then analysis proceeds to the fifth and final step.

The final step of the sequential analysis requires the Commissioner to consider the claimant's

RFC, age, education, and work experience to determine whether the claimant can make an adjustment

to other work.  20 C.F.R. §§ 416.920(a)(4)(v) & (g) (West 2014).  If a claimant can make such an

adjustment the claimant will be found not disabled. *Id.*  If an adjustment cannot be made then the

claimant is disabled. *Id.*

## IV. ALJ's FINDINGS

After careful consideration of the disability standards and the entire record, ALJ Allen made

the following findings:

1. Plaintiff has not engaged in substantial gainful activity since May 3, 2010, the application date.

2. Plaintiff has the following severe impairments that can best be described as obesity, degenerative disc disease, degenerative joint disease of the back and hips, gastroesophageal reflux disease (GERD), and migraines.

3. Plaintiff does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1.

4. After careful consideration of the entire record, the undersigned finds that Plaintiff has the RFC to perform sedentary work as defined in 20 C.F.R. § 416.967(a) that allows for the performance of simple, unskilled tasks.  Work should not be performed at heights or using ropes, ladders, or scaffolds.  Work should not be performed around dangerous moving machinery.  Work should entail no more than occasional (meaning up to one third of the time) use of ramps or stairs, stooping, crouching, crawling, or kneeling. Work should not involve more than incidental exposure to extremes of cold, heat, humidity, vibration, fumes, dust, or gases.  Work should not entail the operation of foot or leg controls.  Work should not entail any overhead lifting or reaching.

5.  Plaintiff is unable to perform any past relevant work.

6.  Plaintiff was born on June 25, 1969 and was 40 years old, which is defined as a younger individual age 45-49, on the date the application was filed.

7.  Plaintiff has a limited education and is able to communicate in English.

8.  Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that Plaintiff is "not disabled," whether or not the claimant has transferable job skills.

9.  Considering Plaintiff's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that Plaintiff can perform.

10. Plaintiff has not been under a disability, as defined in the Social Security act, since May 3, 2010, the date the application was filed.

## V. STANDARD OF REVIEW

This Court exercises jurisdiction over the final decision of the Commissioner pursuant to 42 U.S.C. § 405(g) and 42 U.S.C. § 1383(c)(3).  *McClanahan v. Comm'r of Soc. Sec.*, 474 F.3d 830, 832-33 (6th Cir. 2006).  On review, this Court must affirm the Commissioner's conclusions unless the Commissioner failed to apply the correct legal standard or made findings of fact that are unsupported by substantial evidence.  *Id.* (citing *Branham v. Gardner*, 383 F.2d 614, 626-27 (6th Cir. 1967)).  The "findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive."  *Miller*, 2014 WL 916945, at *3 (quoting 42 U.S.C. § 405(g)). "The substantial-evidence standard requires the Court to affirm the Commissioner's findings if they are supported by 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'"  *Cole v. Astrue*, 661 F.3d 931, 937 (6th Cir. 2011) (quoting *Richardson v. Perales*, 402 U.S. 389, 401 (1971)).  Substantial evidence is more than a scintilla of evidence but less than a preponderance."  *Miller*, (quoting *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234 (6th Cir. 2007)).  "An ALJ's failure to follow agency rules and regulations 'denotes a lack of substantial evidence, even where the conclusion of the

ALJ may be justified based upon the record.'"  *Cole*, 661 F.3d at 937 (quoting *Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399, 407 (6th Cir. 2009).  "The findings of the Commissioner are not subject to reversal merely because there exists in the record substantial evidence to support a different conclusion . . . This is so because there is a 'zone of choice' within which the Commissioner can act, without the fear of court interference."  *Buxton v. Halter*, 246 F.3d 762, 772 (6th Cir. 2001)(citations omitted).

## VI. DISCUSSION

### A.  PLAINTIFF'S ALLEGATIONS

In her brief, Plaintiff alleges that the ALJ's determination that Plaintiff is not disabled is not supported by substantial evidence.  Plaintiff's first assertion is that the ALJ erred in weighing the opinion evidence of Dr. Siddiqui and Dr. Becker concerning claimant's physical and mental limitations. Plaintiff's second assertion is that ALJ Allen erred in applying the *Drummond* rule to the case in order to adopt the RFC findings previously made by ALJ Masengill.  By adopting the prior RFC findings, Plaintiff argues that ALJ Allen failed to account for Plaintiff's changed circumstances (Docket No. 17, pp. 8-16 of 16).

### B.  DEFENDANT'S RESPONSE

Defendant disagrees with Plaintiff's assignments of error and argues that ALJ Allen's decision concerning the weight she attributed to the opinions of Dr. Siddiqui and Dr. Becker was proper and based on substantial evidence.  Defendant also argues that ALJ Allen properly applied the *Drummond* Ruling and SSAR 98-4(6), in adopting the prior RFC finding previously made by ALJ Masengill (Docket No. 19, pp. 7-8; 9-10 of 11).

### C.  ANALYSIS

#### 1.  MEDICAL SOURCE OPINIONS

In ALJ Allen's decision, he indicated that he gave little weight to Dr. Siddiqui's opinion

27

concerning Plaintiff's mental limitations noting that Dr. Siddiqui is not a mental health specialist, and citing to Plaintiff's testimony concerning her daily activities which contradict the limitations assessed by Dr. Siddiqui.  Plaintiff cites to *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 243 (6th Cir. 2007), and argues that the opinion of a treating physician is entitled to great deference and when an ALJ discounts the treating physician's opinion, the ALJ must provide good reasons for doing so.  Plaintiff argues that the law requires more of a rationale than stating that the opinion of a treating physician disagrees with the opinion of a non-treating physician or that the objective medical evidence does not support such evidence (Docket No. 17, pp. 9 of 16).  Plaintiff contends that Dr. Siddiqui's opinion is consistent with the findings of Dr. Becker, a mental health specialist, who also examined Plaintiff (Docket No. 17, pp. 10-12 of 16).

Defendant disagrees and contends that Dr. Siddiqui's opinions concerning Plaintiff' mental limitations are extreme and unsupported by the evidence of record.  Defendant notes that there is no evidence that Plaintiff received any formal treatment to address her complaints and that the only mental health treatment she received consisted of medication management from her primary care physician, Dr. Siddiqui (Docket No. 19, pp 7 of 11).

### a.  THE TREATING PHYSICIAN RULE

The regulations prescribe certain standards with which an ALJ must comply when assessing the medical evidence contained in the record.  The treating physician rule is one such standard and requires that a treating physician's assessment be given controlling weight if it is "well-supported by medically acceptable clinical and laboratory diagnostic techniques," and not otherwise "inconsistent with the other substantial evidence in the case record."  *Hensley v. Astrue*, 573 F.3d 263, 266 (6th Cir. 2009) (quoting *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 548 (6th Cir. 2004); *Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399, 406 (6th Cir. 2009); *Sawdy v. Comm'r of Soc. Sec.*, 436 Fed.Appx. 551, 553 (6th Cir.

2011)(unreported); *Karger v. Comm'r of Soc. Sec.*, 414 Fed.Appx. 739, 751 (6th Cir. 2011)(unreported); *Tilley v. Comm'r of Soc. Sec.*, 394 Fed.Appx. 216, 222 (6th Cir. 2010)(per curiam)(unreported)(citations omitted); *see also* SSR 96-2P, 1996 WL 374188, *1 (July 2, 1996)("Controlling weight may not be given to a treating source's opinion unless the opinion is well-supported by medically acceptable clinical and laboratory diagnostic techniques.")  The rationale for the rule is that  treating physicians "are likely to be the medical professionals most able to provide a detailed, longitudinal picture of your medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone or from reports of individual examinations, such as consultative examinations or brief hospitalizations." 20 C.F.R. § 404.1527(c)(2) (West 2014).

A treating physician's opinion is not subject to heightened scrutiny for the purpose of affording the opinion little weight.  *Gayheart v. Comm'r of Soc. Sec.*, 710 F.3d 365, 377 (6th Cir. 2013).  To reject a treating physician's opinion requires more than a finding that such an opinion conflicts with those of a non-examining or consulting physician.  *Id.*  In *Gayheart*, the Sixth Circuit explained:

> Surely the conflicting substantial evidence must consist of more than the medical opinions of the nontreating and nonexamining doctors.  Otherwise the treating-physician rule would have no practical force because the treating source's opinion would have controlling weight only when the other sources agreed with that opinion.  Such a rule would turn on its head the regulation's presumption of giving greater weight to treating sources because the weight of such sources would hinge on their consistency with nontreating, nonexamining sources.

*Id.*  If the treating physician's opinion is not afforded controlling weight, the ALJ must apply a list of factors set forth in the regulations to determine the weight of the opinion including:  the length of the treatment relationship and frequency of examination; the nature and extent of the treatment relationship; the relevant evidence provided in support of the opinion; the quality of explanation; the consistency of the opinion with the record as a whole; and any other relevant factors which tend to support or

29

contradict the opinion.  20 C.F.R. §§ 404.1527(c)(2)-(c)(6) & 416.927 (West 2014); *Blakley*, 581 F.3d at 406.

Where an ALJ discounts the treating physicians' opinions, the ALJ must provide "good reason" for discounting the opinions, which are "sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight." *Rogers*, 486 F.3d at 242 (citing SSR 96-2, 1996 WL 374188, *5); *Blakley*, 581 F.3d at 407. In *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004), the Sixth Circuit recognized that "'[t]he requirement of reason-giving exists, in part, to let claimants understand the disposition of their cases,' particularly in situations where the claimant knows that his physician has deemed him disabled and therefore 'might be especially bewildered when told by an administrative bureaucracy that she is not, unless some reason for the agency's decision is supplied.'" *Id*. (citing *Snell v. Apfel*, 177 F.3d 128, 134 (2nd Cir. 1999)).  "The requirement also ensures that the ALJ applies the treating physician rule and permits meaningful review of the ALJ's application of the rule."  *Wilson*, 378 F.3d at 544.  The *Wilson* court stated that to meet this obligation to give good reasons for discounting a treating source's opinion, the ALJ must (1) state that the opinion is not supported by medically acceptable clinical and laboratory techniques or is inconsistent with other evidence in the case record; (2) identify evidence supporting such finding; and (3) explain the application of the factors listed in 20 C.F.R. § 404.1527(d)(2) to determine the weight that should be given to the treating source's opinion. *Allums v. Commissioner*, 2013 WL 5437046, *3 (N.D.Ohio,2013) (citing *Wilson,* 378 F. 3d at 546).

Before assigning any weight to the opinions of a claimant's medical sources, the ALJ must determine which physicians or psychologists are "treating sources."  A physician or psychologist "is a treating source if he has provided medical treatment or evaluation and has had an ongoing treatment relationship with the claimant . . . 'with a frequency consistent with accepted medical practice for the

30

type of treatment and/or evaluation that is typical for the treated condition(s).'" *Blakley*, 581 F.3d at 407 (quoting 20 C.F.R. § 404.1502). A nontreating source, on the other hand, is defined as a "physician, psychologist, or other acceptable medical source who has examined you but does not have, or did not have, an ongoing treatment relationship with you," which includes a consultative examiner for the agency. 20 C.F.R. § 404.1502 (West 2014).

Here, it is clear that Dr. Siddiqui is Plaintiff's treating physician. The record contains treatment documentation for at least 25 visits Plaintiff made to see Dr. Siddiqui from January 13, 2009 through March 13, 2012. With respect to Dr. Becker, the record notes one consultation with Dr. Becker on May 11, 2010. The record of the visit indicates that Dr. Becker conducted an assessment of Plaintiff at the request of the Richland County Job and Family Services. The record contains no other evidence that Dr. Becker and Plaintiff had an ongoing treatment relationship. Therefore, Dr. Becker is appropriately classified as a nontreating source.

### b. DR. SIDDIQUI AND DR. BECKER

While ALJ Allen does not specifically mention Dr. Siddiqui by name in his decision, he does reference specific evidence from Dr. Siddiqui by exhibit number. During his analysis of Dr. Siddiqui's findings concerning Plaintiff's physical limitations, ALJ Allen noted that he assigned little weight to Dr. Siddiqui's findings because they are more restrictive than the objective evidence suggests (Docket No. 11, pp. 20 of 553). During his earlier analysis of the objective medical evidence, ALJ Allen highlighted Plaintiff's physical examination from May 2010 and X-ray results in November 2011, to conclude that her symptoms may be different, but that the evidence indicates Plaintiff's physical condition has not worsened since the ALJ prior decision of March 11, 2010. In addition to citing to the medical evidence, ALJ Allen also cited to statements Plaintiff made to Dr. Toward in May 2010, concerning her daily activities which ALJ Allen determined contradicted Dr. Siddiqui's findings

31

concerning Plaintiff's physical limitations (Docket No. 11, pp. 19-20 of 553).

In assessing the psychological evidence, ALJ Allen explained his decision to give Dr. Siddiqui's opinion concerning Plaintiff's mental limitations little weight, noting that Dr. Siddiqui is Plaintiff's primary care physician and not a mental health specialist.  ALJ Allen also indicated that Dr. Siddiqui's findings concerning Plaintiff's mental limitations contradict Plaintiff's testimony about her daily activities, which include caring for children, supporting them at school functions, and attending church. With respect to Dr. Becker's opinion and assessment, which Plaintiff contends supports Dr. Siddiqui's findings, ALJ Allen's determination is consistent.  ALJ Allen gave Dr. Becker's opinions little weight, noting that they, too, are more restrictive than the evidence indicates. ALJ Allen again cited to Plaintiff's testimony concerning her daily activities and concluded that the testimony contradicts Dr. Becker's limitations (Docket No. 11, pp. 20-21 of 553).

Since ALJ Allen did not find Dr. Siddiqui's or Dr. Becker's opinions compelling, he afforded the contravening State Agency's physical and psychological consultants' opinions "great weight." ALJ Allen's noted that the agency consultants' opinions are consistent with the entire medical record, and he highlighted the expertise of the agency experts in their understanding of the disability programs and evidentiary requirements (Docket No. 11, pp. 20 of 553).

Based on ALJ Allen's analysis, the undersigned Magistrate finds that Dr. Siddiqui's opinion was properly discounted and supported by substantial evidence.  While ALJ Allen did not explicitly identify and name the factors set forth in 20 C.F.R. §§ 404.1527(c)(2) & 416.927, his decision reflects contemplation and application of those factors during his assessment of the disputed opinion evidence. While discounting Dr. Siddiqui's opinion and findings, ALJ Allen referenced the nature and extent of the relationship when referencing Dr. Siddiqui as Ms. Park's primary care physician (See Docket No. 11, pp. 20 of 553).  He referenced Dr. Siddiqui's lack of specialization when he noted Dr. Siddiqui is

not a mental health specialist during his analysis of Dr. Siddiqui's opinions concerning Plaintiff's mental limitations (See Docket No. 11, pp. 20 of 553).  Furthermore, he noted that Dr. Siddiqui's opinions lack any explanation or examples to support those findings on either of the forms he completed (See Docket No. 11, pp. 454; 463-464 of 553).  During both of his discussions discounting Dr. Siddiqui's physical and mental limitation findings, ALJ Allen referenced the contradictory evidence which undermines Dr. Siddiqui's findings, including the objective medical record, testimony, and statements made by Plaintiff (See Docket No. 11, pp. 19-21 of 553).  The record concerning Plaintiff's mental limitations consists, almost entirely, of Plaintiff's subjective statements made to Dr. Siddiqui and Dr. Becker (See Docket No. 11, pp. 20; 430-451; 465-467 of 553).

ALJ Allen also correctly notes that both Dr. Siddiqui and Dr. Becker's findings concerning Plaintiff's mental limitations are contradicted by her own testimony concerning her activities of daily living (Docket No. 11, pp. 20-21).  Plaintiff described caring for the children, teaching them to cook, playing board games with her niece, supporting the children at school functions, attending church, and serving as a youth leader among her daily activities.  She testified that she was able to read a book a week and play a Yahtzee video game despite her difficulties with maintaining concentration (See Docket No. 11, pp. 47-49; 51-52 of 553).  Such testimony substantially contradicts the mental limitations assessed by Dr. Becker in his mental functional capacity assessment, which notes that Plaintiff has marked limitations in areas of functioning including completing tasks, maintaining attention and concentration, and being able to consistently complete a work day without impairment related difficulty (See Docket No. 11, pp. 428 of 553).  Plaintiff's testimony also contradicts Dr. Siddiqui's mental functional capacity assessment which noted moderate to significant limitations in Plaintiff's ability to function in nearly all areas assessed, including her ability to socially interact; remember and carry out job instructions; and to manage funds, schedules, social situations, and behave

33

in an emotionally stable manner (See Docket No. 11, pp. 463-464 of 553).  Plaintiff's limitations as determined by both Doctors Becker and Siddiqui are contradicted not only by the Plaintiff's testimony, but are also unsupported by the medical record and not otherwise explained or rationalized in any documentation contained in the record.

ALJ Allen's determination that Dr. Siddiqui's findings concerning Plaintiff's physical limitations are more restrictive than the medical record indicates, is also supported by substantial evidence.  As ALJ Allen noted in his decision, the most recent X-ray, CT Scan, and MRI reports do not indicate that Plaintiff's conditions have worsened or resulted in any further degree of loss of function (See Docket No. 11, pp. 19-20 of 553).  Dr. Siddiqui, however; indicated that Plaintiff had moderate and marked limitations in her ability to push, pull, bend, reach, and handle.  Dr. Siddiqui also noted a number of time limitations concerning Plaintiff's ability to stand, sit, and lift weight during a hypothetical work shift, but in the space provided on the form where it requests medical evidence and observations to support such findings, Dr. Siddiqui provided no response, example, or explanations (See Docket No. 11, pp. 454 of 553).  Dr. Siddiqui's medical treatment records also do not contain notations which would lend credibility to his findings on the form.  The most recent X-ray, CT Scan, and MRI reports are inconsistent with the physical limitations assessed by Dr. Siddiqui.

## 2.     ALJ ALLEN'S ADOPTION OF PRIOR RFC FINDINGS

Plaintiff's next assignment of error concerns ALJ Allen's adoption of the RFC determination made by ALJ Masengill in her decision of March 11, 2010.  Plaintiff contends that the record contains evidence of her changed circumstances which ALJ Allen did not address by applying the rule from *Drummond v. Comm'r of Soc. Sec.*, 126 F.3d 837, 838 (6th Cir. 1997), and adopting ALJ Masengill's prior RFC determination.  Plaintiff suggests that a new RFC analysis would have led to the determination that she is unemployable and therefore disabled.  Plaintiff bases this conclusion on her

34

need for a sit, stand, and walk option and VE Coleman's testimony that "Plaintiff would be unemployable if she required a sit/stand option" (Docket No. 17, pp. 12-16 of 16).

Defendant disagrees and argues that in *Drummond*, the Sixth Circuit held that the ALJ was bound to adopt a sedentary RFC finding from a decision on a prior claim because there was no evidence that the claimant's condition improved after the prior ALJ's decision to the extent that she could now perform medium work.  Defendant contends that the ALJ properly applied the *Drummond* rule (Docket No. 19, p. 9 of 11).

### a.    THE *DRUMMOND* RULE

In *Drummond*, the Sixth Circuit Court of Appeals addressed the effect of an initial ALJ's determination on a subsequent assessment by the Commissioner.  *Drummond*, 126 F.3d 837.  In their decision, the *Drummond* Court noted principles of finality and fairness in holding that "[a]bsent evidence of an improvement in a claimant's condition, a subsequent ALJ is bound by the findings of a previous ALJ." *Id.* at 842.

In her prior decision from March 11, 2010, ALJ Masengill determined that Plaintiff had the RFC to perform sedentary work that allowed for the performance of simple, unskilled tasks with certain physical and environmental exceptions.  ALJ Allen's decision summarized ALJ Masengill's decision and Plaintiff's prior application concluding that the prior RFC determination was supported by the record.  ALJ Allen appropriately concluded that the record contains no evidence of a further degree of loss of limitation or any new limitations not already accounted for in the March 11, 2010, decision (Docket No. 11, pp. 19 of 553).

### b.    PLAINTIFF'S CHANGED CIRCUMSTANCES

In support of Plaintiff's assertion that the record contains evidence of her changed conditions, she cites to Dr. Wolfe's treatment notes from September 20, 2011, through November 10, 2011.

Plaintiff notes that Dr. Wolfe's physical examination noted an array of symptoms including tender joints, knee pain, and lost sensation, as well as MRI results indicating degenerative disc disease. Plaintiff also cites testimony from the administrative hearing where she complained of knee and leg pain, swelling, and indicated that she required a cane or walking stick because her knees give out. Plaintiff argues that a stand/sit option must be considered in a proper evaluation of her disability claim (Docket No. 17, pp 13-14 of 16).

ALJ Allen specifically referenced Dr. Wolfe's treatment records in his analysis and reasoning for adopting the prior RFC findings of ALJ Masengill, noting, in relevant part, that "the record shows exaggerated pain symptoms by the claimant as progress notes . . . suggest reasonable pain control, as well as the claimant's choice to continue with conservative and non-aggressive forms of treatment . . ." (Docket No. 11, pp. 21 of 553).  The treatment records from Plaintiff's last follow up visit with Dr. Wolfe on November 10, 2011, provide:

> [Ms. Parks] is here for followup.  She's making some progress with therapy.  She's using minimal medication.  Films show some spondylosis and degenerative disc disease.  She's not at the point where she feels she needs injections.

(Docket No. 11, pp. 539 of 553).  It is unclear how Dr. Wolfe's findings support Plaintiff's assertion of evidence of changed circumstance as it confirms and supports ALJ Allen's assertions that Plaintiff's conditions have improved rather than worsened.  Dr. Wolfe's notes clearly indicate that Plaintiff is progressing with treatment and requires minimal medication to control symptoms as of November 10, 2011.

ALJ Allen's findings concerning Plaintiff's credibility are also well taken (Docket No. 11, pp. 22 of 553).  Plaintiff's testimony in April 2012, is unsupported by the objective medical record and most notably, contradicts the statements she made to Dr. Toward in May 2010, in which she indicated she was able to work, care for herself, and complete housework, but had not sought employment

because she had been told not to until SSI provided her with guidance concerning what she was capable of doing.  The objective medical records, including Plaintiff's latest x-rays and CT scan fail to indicate any new or worsening condition or functioning not previously addressed by ALJ Masengill's prior decision, which would require a new RFC analysis.

### 3.    VE TESTIMONY

Plaintiff argues that by definition, sedentary work involves substantial sitting with some walking and standing.  Plaintiff notes that VE Coleman "testified that Plaintiff would be unemployable if she required a sit/stand option" (Docket No. 11, pp. 14 of 16).  Plaintiff mischaracterizes VE Coleman's testimony.

During the hearing on April 20, 2012, Plaintiff's counsel asked VE Coleman:

Mr. Coleman, assuming the Judge's first hypothetical, but adding to that the claimant would require a sit/stand option at will that allowed her, while standing, to actually walk around as needed to relieve symptoms of pain and tightness in the muscles and bones . . . would she be able to still perform the work that you've identified?

(Docket No. 11, pp. 61-62 of 553).  VE Coleman responded:

The sit/stand variance is not addressed in the DOT, but it is, in my experience the labor market, is permitable in certain unskilled, sedentary work settings.  But if its going to be . . . if the individual is going to be having to stand and move, they're going to be off task . . . away from . . what they're doing at the unskilled sedentary work setting, then that's going to take them away from their work and where they're not performing their work, and if consistent . . . if that time period, if they're constantly needing to move and adjust and walk around, as I believe that is what you said . . . then they're away from their workstation and not performing their work . . . and so that's going to be . . . they're not performing their work at an SGA level.

(Docket No. 11, pp. 62 of 553).  VE Coleman further concluded that such an individual could be an undue burden on the employer.

In his decision, ALJ Allen noted that there was no evidence to support Plaintiff's testimony that she must constantly change positions (Docket No. 11, pp. 22 of 553).  After reviewing the record, the

undersigned agrees and notes that even if such an option were determined necessary, the evidence of Plaintiff's daily activities falls short of showing that Plaintiff requires work related activities at the sedentary level with a sit/stand option.  Neither has Plaintiff demonstrated with the medical evidence that her occupational base would be significantly eroded by the lack of a sit/stand option.  Taking the testimony of the VE as well as the record as a whole, the Magistrate cannot conclude that a new RFC to account for a sit/stand option is supported by the evidence.

The Magistrate finds that ALJ Allen's decision concerning Plaintiff's RFC is supported by substantial evidence and accordingly, such finding must be affirmed.

## VII. CONCLUSION

For the foregoing reasons, the Magistrate affirms the Commissioner's decision.

**IT IS SO ORDERED**.


/s/Vernelis K. Armstrong
United States Magistrate Judge


Date:   April 14, 2014


38